Rodney B. Sorensen, Bar No. 196926
rbs@paynefears.com
Rhianna S. Hughes, Bar No. 266396
rsh@paynefear.com
Robert T. Matsuishi, Bar No. 259182
rtm@paynefears.com
PAYNE & FEARS LLP
Attorneys at Law
235 Pine Street, Suite 1175
San Francisco, California 94104
Telephone: (415) 398-7860
Facsimile: (415) 738-6855

Attorneys for Plaintiff E*TRADE FINANCIAL CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E*TRADE FINANCIAL CORPORATION, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>JULIE FALCHI, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 19-cv-02924<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF** |

Plaintiff E*TRADE FINANCIAL CORPORATION ("E*TRADE"), by and through its counsel, hereby alleges as follows:

**PARTIES**

1. E*TRADE is now, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. E*TRADE is a financial services company that provides a variety of services for individuals and institutions including the purchase and sale of financial securities, lending, online banking, and cash management services. E*TRADE is Defendant Julie Falchi's ("Falchi") former employer.

2. E*TRADE is informed and believes, and thereon alleges, that Defendant Julie Falchi is now, and at all times herein mentioned was, a resident of San Francisco County, California. Falchi served as a corporate services financial consultant for E*TRADE in its Palo Alto and San Francisco, California offices from approximately May 2, 2011 to May 10, 2019, when she abruptly resigned her position to work for one of E*TRADE's largest competitors, Morgan Stanley, in Palo Alto, California.

3. E*TRADE is unaware of the true names and capacities of Defendants sued herein as DOES 1-10, inclusive, and therefore sues said DOE Defendants by such fictitious names. E*TRADE will amend this Complaint to insert the true names and capacities of such fictitiously named DOE Defendants when they have been ascertained. E*TRADE is informed and believes, and thereon alleges, that each of the Defendants designated herein as a DOE is in some manner legally responsible for the events and happenings referred to and alleged herein and by reason thereof has proximately caused the damages and injuries to E*TRADE alleged in this Complaint.

4. E*TRADE is informed and believes, and thereon alleges, that at all times material hereto, each Defendant named herein, including those fictitiously designated as DOES 1-10, was acting as the agent, servant, or employee of each other Defendant, and in doing the acts hereinafter alleged, was acting within the course and scope of said agency, employment, or representation,

with the knowledge, consent, authorization, and approval of the other Defendants. To the extent any of the actions of said agents, servants, or employees were not expressly authorized, said actions were ratified and approved by the other Defendants.

## JURISDICTION

5. This Court has original jurisdiction over this action founded on diversity of citizenship pursuant to 28 U.S.C. § 1332(a) because the matters in controversy exceed $75,000, exclusive of interest and costs, and because complete diversity exists between E*TRADE and Falchi. With regard to the amount in controversy, E*TRADE has not only incurred damages in excess of $75,000 as a result of the wrongful conduct alleged herein, but the preliminary injunction E*TRADE requests by way of this action seeks to prevent additional loss from further wrongdoing, the amount of which also exceeds $75,000. With regard to citizenship, there is complete diversity since E*TRADE is a citizen of both Delaware and New York, and E*TRADE is informed and believes that Falchi is a citizen of California.

6. Venue is proper in the Northern District of California in accordance with 28 U.S.C. § 1391(b)(1)-(2) for the following reasons: (1) E*TRADE is informed and believes that Falchi is a resident of San Francisco County; (2) Falchi was employed in E*TRADE's Palo Alto and San Francisco, California offices; (3) the agreements at issue herein were entered into in this district; and (4) Falchi currently works for Morgan Stanley in Palo Alto, California and has been soliciting E*TRADE's clients on behalf of Morgan Stanley.

7. Contemporaneous with this filing, E*TRADE is filing a Statement of Claim with the Financial Industry Regulatory Authority ("FINRA"), commencing an arbitration against Falchi. Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes authorizes E*TRADE to seek a preliminary injunction from this Court to maintain the status quo pending final resolution in arbitration. This is precisely what E*TRADE is doing by way of this action – seeking a preliminary injunction to end Falchi's continuing misappropriation and misuse of E*TRADE's trade secrets and breach of her contractual obligations.

**INTRADISTRICT ASSIGNMENT**

8.  Assignment to the San Francisco Division is proper under Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to the claims occurred in San Francisco County.

**GENERAL ALLEGATIONS**

9.  E*TRADE provides many different lines of financial services to a wide variety of clients.  Unlike traditional broker-dealers, E*TRADE clients conduct the vast majority of their business through E*TRADE's website and mobile application.  Most of the account holders associated with E*TRADE's more than 6.9 million accounts conduct business over the internet without ever speaking to an individual broker or financial consultant.  Historically, E*TRADE has attracted clients through extensive and costly advertising campaigns in various media outlets; not through direct solicitations of individual clients by financial consultants.  As a direct result of E*TRADE's significant expenditures, it has developed extensive client lists and databases regarding its most profitable corporate clients and individual clients.

10.  E*TRADE takes substantial precautions to maintain and protect the secrecy of its clients' private information.  For example, E*TRADE maintains a proprietary computer network which is secured by password and user ID protections to prevent unauthorized access.  Moreover, E*TRADE limits access to client information to those employees who have a need to know it.  E*TRADE requires those employees to agree to maintain the confidentiality of proprietary client information.  Likewise, E*TRADE circulates to its employees a Code of Professional Conduct which contains detailed information regarding the use of its clients' information.

11.  Falchi worked for E*TRADE as a corporate services financial consultant in Palo Alto and San Francisco, California from approximately May 2, 2011 to May 10, 2019.  In this capacity, Falchi had access to confidential information concerning E*TRADE's clients, which presently total approximately 6.9 million accounts nationwide.

12. In her role as a corporate services financial consultant, Falchi was assigned, by E*TRADE, to service stock plan participants of E*TRADE's corporate clients. These corporate clients engaged E*TRADE's services to manage their employees' company stock portfolios. Many of the individual stock plan participants also maintained separate retail accounts at E*TRADE. Unsolicited client communications were also randomly routed to Falchi, as well as other E*TRADE relationship managers. Handling these communications did not make these individuals or entities Falchi's clients.

13. E*TRADE is informed and believes, and thereon alleges, that every client Falchi serviced while she was with E*TRADE was assigned to her by E*TRADE or introduced through an existing E*TRADE relationship. Thus, E*TRADE is informed and believes, and thereon alleges, that none of the E*TRADE clients Falchi serviced had a prior professional relationship with Falchi before they engaged E*TRADE's services, nor were they solicited by Falchi to do business with E*TRADE.

14. Knowing that she would have access to, among other things, confidential client information, Falchi entered into confidentiality agreements with E*TRADE at the outset of her employment. A true and correct copy of the Nonsolicitation and Nondisclosure Agreement (the "Agreement") and the Agreement Regarding Employment and Proprietary Information and Inventions that employees at E*TRADE sign are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

15. Falchi not only acknowledged the confidential nature of E*TRADE's client information, but she agreed not to remove or copy the information and to return any and all such information upon separating from the company. Falchi also specifically agreed not to use any confidential information to solicit or attempt to solicit any of E*TRADE's clients to do business with her personally or with another company in competition with E*TRADE.

16. Regarding the use and disclosure of E*TRADE's confidential information, the Agreement specifically provides:

- "[Falchi] acknowledges that [E*TRADE's] business is highly specialized, the identity and particular needs of [E*TRADE's] clients are not generally known, and

-5-
Case No.
COMPLAINT FOR INJUNCTIVE RELIEF

some or all of the documents and information regarding [E*TRADE's] finances, clients, services, methods of operation, sales, pricing, and costs are highly confidential.  [Falchi] further acknowledges that the services rendered to [E*TRADE] by [Falchi] have been or will be of a special and unusual character that have a unique value to [E*TRADE] and that [Falchi] has had or will have access to trade secrets and Confidential Information belonging to [E*TRADE], the loss of which cannot be adequately compensated by damages in an action at law." (Ex. A at ¶ 1.)

- "Either during or after [Falchi's] employment with [E*TRADE], [Falchi] will not, without [E*TRADE's] prior permission, directly or indirectly utilize or disclose to anyone outside of [E*TRADE], or permit access by unauthorized persons or entities to, any Confidential Information, and will take all reasonable precautions to prevent any person or entity access to any of the Confidential Information, other than as required in the performance of [Falchi's] duties with [E*TRADE].  [Falchi] shall not, directly or indirectly, copy, take, send, or remove from [E*TRADE's] premises or computer systems (except with the written consent of [E*TRADE]), any of [E*TRADE's] books, records, client lists, electronic data information, or any other documents or materials containing Confidential Information." (Ex. A at ¶ 4.)

17. The term "Confidential Information" as used in the Agreement is defined as: "non-public information of value to [E*TRADE] that [Falchi] learned in connection with [Falchi's] employment with [E*TRADE] and that would be valuable to a competitor." (Ex. A at p. 2.)  The term includes, but is not limited to:

- "Information of a technical nature such as methods, know-how, formulae, compositions, processes, discoveries, machines, inventions, computer programs, IT server architecture or processes, or similar items or research projects;"
- "Information of a business nature such as financial statements, balance sheets, business plans, client lists, contemplated or actual product offerings, processes for filling client orders, and information about employee performance or

-6-  Case No.
COMPLAINT FOR INJUNCTIVE RELIEF

compensation, profits, markets, sales, pricing, or margin requirements;" and

- "Information regarding [E*TRADE's] clients, such as client data resident on databases available to [Falchi], as well as pricing arrangements, investment preferences, risk tolerances, trading or account histories or tendencies, positions, and contact information, and other [E*TRADE] Information which is not generally known to the public. Confidential Information does not include any information: (a) that is in the public domain at the time of disclosure by [E*TRADE] to [Falchi] or that subsequently comes into the public domain through no violation of this Agreement by [Falchi] or similar agreements by other employees of [E*TRADE] or (b) that is already known by [Falchi] through public sources at the time of its disclosure by [E*TRADE], as evidenced by written documentation existing prior to such disclosure." (Ex. A at pp. 2-3.)

18. Specifically regarding the prohibited use of E*TRADE's confidential information to solicit clients and potential clients, the Agreement provides:

"Both during the term of [Falchi's] employment with [E*TRADE] and after [Falchi's] employment with [E*TRADE], [Falchi] will not, directly or indirectly, utilize any Confidential Information as defined in paragraph 4, to solicit, induce, or attempt to solicit or induce, any Client or Potential Client of [E*TRADE] to purchase from [Falchi] or any other person, firm, partnership, corporation, limited liability company, or other entity, goods or services competitive with those offered and/or provided by [E*TRADE]. For purposes of this Agreement, a 'Client' and/or 'Potential Client' is a person, company, and/or entity that [E*TRADE] currently conducts business with, has conducted business with in the past, or has attempted to conduct business with at any time. [Falchi] expressly acknowledges that this provision is necessary to protect [E*TRADE's] trade secrets." (Ex. A, ¶ 6.)

19. In addition, regarding the return of E*TRADE's confidential information, the Agreement provides:

"[Falchi] agrees that upon termination of employment or, prior to such termination at the

request of [E*TRADE], [Falchi] shall return to [E*TRADE] all documents, copies, recordings of any kind, papers, computer records or programs, drawings, manuals, letters, notes, notebooks, reports, formulae, memoranda, client lists, and other material in [Falchi's] possession or under [Falchi's] control that relate to [E*TRADE's] business and that [Falchi] obtained in connection with employment with [E*TRADE].  [Falchi] further agrees to return all tangible property of [E*TRADE] in [Falchi's] possession or under [Falchi's] control, including any computer equipment, cell phones, Blackberries, pagers, and keys.  [Falchi] also agrees to delete any Confidential Information (especially client contact information) found on [Falchi's] cell phone, Blackberry, PDA, personal data device, home computer, or personal e-mail account(s)." (Ex. A, ¶ 7.)

20. Falchi was further informed of the confidentiality of E*TRADE's client information in E*TRADE's Code of Professional Conduct (the "Code"), which she acknowledged annually. The Code provides: "E*TRADE employees are required as a condition of their employment to agree to maintain the confidentiality of proprietary information (as defined by applicable policies and control standards, including customer and employee information, to which they may have access during the course of their employment)." (*See* pp. 11-12.)  A true and correct copy of the relevant portion of the Code is attached hereto as **Exhibit C**.

21. During her employment with E*TRADE, Falchi also regularly received and acknowledged her agreement with E*TRADE's Incentive Compensation Plan, which described the sales incentive compensation plan effective for a given time period.  A true and correct copy of the relevant portions of E*TRADE's most recent Incentive Compensation Plan is attached hereto as **Exhibit D**.

22. To participate in the plan, employees must be specifically designated as participants and they must have received and signed the plan acknowledgement form.  Employees must also have signed the Agreement to participate in the plan.  Employees are not be eligible to receive any payout under the plan unless and until they have signed both the plan acknowledgement form and the Agreement.  Falchi herself participated in and agreed to E*TRADE's Incentive Compensation Plan multiple times and received appropriate compensation

under the plan. Contained in each plan acknowledgement was (1) Falchi's agreement and affirmation that she understood, had complied with, and would continue to comply with the Agreement, and (2) Falchi's agreement and affirmation that she personally executed the Agreement. (*Id.*)

23. On May 10, 2019, Falchi unexpectedly resigned from E*TRADE, effective immediately. A true and correct copy of Falchi's resignation letter, dated May 10, 2019, is attached hereto as **Exhibit E**.

24. In her resignation letter, Falchi stated that she was affiliating with Morgan Stanley, provided her contact information at her new employer, and requested that E*TRADE direct any clients to Falchi at her new employer.

25. Falchi's letter also stated that she "do[es] not possess any originals or copies of E*TRADE proprietary documents." Falchi further stated that she was leaving her electronic building pass, E*TRADE badge, and laptop. These statements demonstrate that Falchi was well aware of her obligation to keep E*TRADE's information confidential and that Falchi understood that this was extremely important to E*TRADE.

26. Despite Falchi's pre-emptive denials of having taken E*TRADE's confidential information, E*TRADE is informed and believes and thereon alleges that Falchi improperly utilized E*TRADE's confidential information, including but not limited to client contact information, pricing arrangements, investment preferences, risk tolerances, and trading or account histories or tendencies, in order to solicit E*TRADE's clients to Morgan Stanley.

27. E*TRADE is informed and believes that in the months leading up to her resignation, Falchi contacted E*TRADE clients to set up meetings on behalf of Morgan Stanley and convince them to transfer their assets and accounts away from E*TRADE.

28. E*TRADE recently performed a forensic review of Falchi's network use at E*TRADE, including Falchi's application usage and the files she accessed on E*TRADE's Genie

database,[1] her phone logs, her e-mail logs, her Salesforce logs,[2] her locally-accessed documents, and her printing logs immediately before her resignation.  During E*TRADE's investigation, it noticed a pattern of activity by Falchi that involved accessing customer accounts or information pertaining thereto with regard to clients that were not part of her book and were not part of her expected area of responsibility.  The evidence suggests that such activity increased on May 2, 2019 until her resignation on May 10, 2019.

29. As part of E*TRADE's forensic investigation, E*TRADE reviewed a history of Falchi's application usage and the files she accessed on E*TRADE's Genie database from January 7, 2019 through May 10, 2019.

30. Because of the highly confidential information contained in the Genie database, E*TRADE employees are required to log in to the database using a unique user name and password.  The user name is assigned by E*TRADE, but the passwords are created by the individual employees.  The initial screen that is presented to an E*TRADE employee when he/she enters the Genie database is a homepage with a search box that allows the employee to search for specific clients by account number or social security number.  If the search box is left blank, the employee can advance to an advanced search function that allows the employee to search for specific clients by name, company, e-mail address, or phone number, in addition to searching by account number or social security number.

---

[1] E*TRADE's Genie database contains the following information for each of the 6.9 million accounts discussed previously: the clients' personal identification information, including but not limited to contact information, date of birth, and social security number, as well as details regarding the clients' account values, account holdings, and account activity.  The Genie database also serves as the main portal for E*TRADE employees to access each clients' electronic account documents, including but not limited to fee schedules, tax records, account statements, and trade confirmations.

[2] E*TRADE's Salesforce database is a database that contains interaction notes between E*TRADE representatives and E*TRADE clients, documenting the substance of client conversations, which often details the relevant client's investment preferences and desires and any action plan developed as a result.

31. On May 17, 2019 (approximately one week after Falchi's resignation), E*TRADE received an e-mail from an E-TRADE client ("Client A")[3] who was previously assigned to Falchi. Client A informed E*TRADE that Falchi had been trying to contact her since she left E*TRADE.

32. Client A's e-mail to E*TRADE forwarded a May 17, 2019, LinkedIn message from Falchi to Client A. Contained within Falchi's message to Client A is certain confidential information regarding Client A's investment style and strategy. E*TRADE is informed and believes, and thereon alleges, that this information could only come from E*TRADE's Genie database.

33. E*TRADE's review of Falchi's activity on E*TRADE's Genie database showed that Falchi accessed Client A's database profile on April 24, 2019 (a little over two weeks before her resignation). Nothing in Falchi's Genie interaction notes[4] indicates an E*TRADE related reason for her accessing Client A's profile during that timeframe. There is also nothing in Falchi's Salesforce notes showing why she contacted Client A on that day. E*TRADE is unaware of any E*TRADE related reason that required Falchi to access this client information.

34. E*TRADE's review of Falchi's activity on E*TRADE's Genie database also revealed the following:

    a. Among the documents Falchi accessed on May 6 and May 7, 2019 (the week of her resignation) were database documents for six E*TRADE clients who were <u>not</u> assigned to Falchi. In fact, of the six clients Falchi accessed, four of the clients are serviced by an entirely different department. E*TRADE is unaware of any sales lead or official directive or reason that required Falchi to access this client information in the time immediately before her departure.

    b. On May 6, 2019 (the week of her resignation), Falchi accessed the database

---

[3] The client's true name has been redacted.

[4] These records are maintained by financial consultants and document each client interaction.

-11-   Case No.
COMPLAINT FOR INJUNCTIVE RELIEF

documents for one client who she had no conversations with since February 2017. That same day, Falchi accessed the database documents for a client household who she had no communications with since March 2019.

E*TRADE is unaware of any sales lead or official directive or reason that required Falchi to access this client information the week of her resignation.

35. As part of E*TRADE's forensic investigation, E*TRADE reviewed Falchi's e-mail history from January 1, 2019 through May 10, 2019. E*TRADE's review of Falchi's e-mail history uncovered one e-mail in particular which is concerning. On May 6, 2019 (the week of her resignation), Falchi sent an E*TRADE client a copy of an analysis of the client's portfolio holdings. This was particularly strange since Falchi's Salesforce logs do not identify her having any conversations with the client since 2015. In fact, at that time, the Salesforce logs have Falchi indicating that the client was self-directed and did not require E*TRADE's assistance.

36. E*TRADE's forensic investigation also reviewed Falchi's locally accessed documents in the months leading up to her resignation. Falchi's locally accessed documents contain non-client-related documents that are otherwise proprietary to E*TRADE.

37. E*TRADE's review of Falchi's locally accessed documents showed that Falchi had accessed two PowerPoint presentations on March 15, 2019. The presentations, labeled "managingyouraccountforusbasedparticipants.pptx" and "Taking.Stock.Final.3.24.2015.pptx", were created by E*TRADE to present to stock plan participants of E*TRADE's corporate clients. The presentations specifically inform the participants how to navigate their stock plan accounts at E*TRADE, including how to incorporate company stock into retirement planning. Finding these documents in Falchi's locally accessed documents history is surprising since it was uncommon for Falchi to be responsible for giving these presentations on behalf of E*TRADE in the years leading up to her resignation. E*TRADE is also unaware of any official directive or reason that required Falchi to access these documents on March 15, 2019. E*TRADE is informed and believes, and thereon alleges, that Falchi accessed these documents in order to use the information contained therein after her anticipated move to Morgan Stanley.

38. As part of E*TRADE's forensic investigation, E*TRADE reviewed Falchi's

1  Salesforce logs from January 2, 2019 through May 9, 2019.  Falchi's Salesforce logs at E*TRADE
2  should contain her notes for every client interaction during that time period.  In fact, E*TRADE
3  personnel are required to include notes for all client interactions in Salesforce.  As part of
4  E*TRADE's forensic investigation, E*TRADE also reviewed a history of Falchi's telephone
5  records at E*TRADE from April 1, 2019 through May 10, 2019.

6  39.  E*TRADE's review of Falchi's Salesforce logs showed significant out of pattern
7  activity in the months leading up to her resignation.  This includes records of approximately 231
8  communications with E*TRADE clients between March 1, 2019 and May 8, 2019, as compared to
9  records of approximately 74 communications with E*TRADE clients between January 2, 2019 to
10 February 28, 2019.  This is over a 300% increase in the number of clients Falchi contacted in the
11 two months leading up to her resignation.

12 40.  E*TRADE is unaware of any sales lead, official directive, or other reason that
13 would explain the marked increase in call activity by Falchi in the two months before her
14 departure from E*TRADE.

15 41.  The activity reflected in Falchi's Salesforce logs also shows a marked
16 inconsistency with her telephone records.  E*TRADE's review of Falchi's telephone records
17 revealed only 12 inbound phone calls to Falchi from April 1, 2019 through May 7, 2019.  Of those
18 phone calls, one was a conference call and four were from the same phone number.

19 42.  E*TRADE is informed and believes, and thereon alleges, that Falchi was engaging
20 in phone conversations with E*TRADE clients on her personal cell phone during this time period.
21 E*TRADE is informed and believes, and thereon alleges, that Falchi used her personal cell phone
22 to communicate with E*TRADE clients to set up meetings on behalf of Morgan Stanley and
23 convince them to transfer their assets and accounts away from E*TRADE.

24 43.  In addition to violating her confidentiality agreements with E*TRADE, Falchi's
25 conduct in this regard violates E*TRADE's express prohibition on using personal cell phones to
26 communicate with clients contained in E*TRADE's Branch Management Handbook (the
27 "Management Handbook"), which was reviewed with Falchi repeatedly throughout her
28 employment with E*TRADE.  A true and correct copy of relevant portions of the Management

Handbook is attached hereto as **Exhibit F**.

44.  Falchi not only frequently reviewed E*TRADE's Management Handbook and the cell phone policy contained therein, but she demonstrated her understanding of the prohibition on using personal cell phones to call clients. Specifically, she reached out to her branch manager and asked for permission to use her cell phone to call E*TRADE clients on one occasion. E*TRADE approved Falchi's request for one day, and one day only, in October 2018. Falchi understood that this was a special circumstance and she was not to communicate with clients on her cell phone (in any manner – talk, text, messenger, or e-mail) on any other occasion. Falchi also understood that after making these calls, she was required to delete all records of the client's name and contact information from her cell phone in accordance with her obligation to maintain the confidentiality of client information.

45.  Since Falchi's resignation, approximately six E*TRADE clients, all of whom were previously assigned to Falchi by E*TRADE, have terminated or are in the process of terminating their accounts with E*TRADE to follow Falchi to Morgan Stanley. True and correct copies of these termination and/or transfer notices are attached hereto as **Exhibit G**.[5] This is a far higher than normal client attrition rate, as E*TRADE saw a total of six clients (representing approximately $1.7 million in assets) who were assigned to Falchi leave in the 12 months leading up to her resignation.

46.  Falchi's conduct has irreparably harmed E*TRADE and will continue to irreparably harm E*TRADE if not stopped immediately. Indeed, Falchi's conduct has and will continue to irreparably harm E*TRADE's relationships with its clients, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated.

47.  E*TRADE is informed and believes that, as a result of Falchi's unlawful use of

---

[5] The confidential information included in these documents, including the clients' true names, has been redacted.

E*TRADE's confidential client information and inappropriate solicitation of E*TRADE's clients, in only two weeks since her resignation, E*TRADE has lost or is in the process of losing approximately $11,664,560 in managed assets and $14,519,924 in total assets.  Based on E*TRADE's forensic review, the company also believes another three accounts, which represent approximately $22,347,227 in managed assets and $33,712,474 in total assets, are at risk of terminating their relationships with E*TRADE.  E*TRADE is informed and believes that Falchi is continuing to use its confidential information to solicit its clients and that the assets E*TRADE is losing as a result will only increase if Falchi's improper conduct continues.

48.     Moreover, E*TRADE's client information, including the identity of E*TRADE clients, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations.  The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its clients and to protect the security and confidentiality of those clients' nonpublic personal information." 15 U.S.C. § 6801(a) (2012).  The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent.  17 C.F.R. § 248.10 (2017).  Nonpublic personal information is defined to include client lists from financial institutions, even if those lists contain only names of E*TRADE clients because the identity of an individual as being a client of a particular financial institution is specifically protected by the federal regulations.  17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017).  Indeed, these regulations also protect a client's account information.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

49.     E*TRADE clients rightfully have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees.  Thus, clients understandably are concerned when former E*TRADE employees and their new employers, such as Morgan Stanley, have access to their information and are using it to solicit their business at a new and different brokerage institution.

50.     In other words, the damage to E*TRADE's client relationships has already

occurred, is ongoing and is incalculable, as E*TRADE cannot put a price on the value of its client relationships or the damage caused when Falchi took and improperly misused confidential and trade secret client information to solicit and divert clients.

51. Based on all the foregoing facts and conduct, E*TRADE believes and thereon alleges that Falchi prepared to engage in, is engaging in, and plans to continue to engage in the following wrongful acts:

   a. use and/or disclosure of E*TRADE's trade secret client information and misappropriation of the trade secret information contained in confidential E*TRADE business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information including but not limited to the account values, account holdings, account activity, fee schedules, and investment strategy of E*TRADE clients;

   b. transmission verbally, in writing or in another manner for the use of a E*TRADE competitor, trade secret client information contained in E*TRADE's records; and

   c. use of E*TRADE's trade secret client information to solicit E*TRADE clients to transfer their assets.

52. E*TRADE has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of clients and client goodwill caused by Falchi's misappropriation and misuse of E*TRADE's trade secret client information and solicitation of E*TRADE's clients in violation of the California and federal law, as well as Falchi's employee agreements.

53. Denial of injunctive relief would also leave E*TRADE vulnerable to the same conduct from other employees.

54. E*TRADE asks for the Court's assistance in protecting that information and stopping Falchi's knowing and intentional wrongful conduct.

## FIRST CAUSE OF ACTION

### (Preliminary Injunction)

55. E*TRADE re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 54 above.

56. Falchi's wrongful conduct in using E*TRADE's confidential client information to solicit clients away from E*TRADE to Morgan Stanley has caused and will continue to cause great and irreparable injury to E*TRADE unless and until Falchi's conduct is enjoined. As described above, in only two weeks since her resignation, E*TRADE has lost or is in the process of losing approximately $11,664,560 in managed assets and $14,519,924 in total assets. The company also believes another three accounts, which represent approximately $22,347,227 in managed assets and $33,712,474 in total assets, are at risk of terminating their relationships with E*TRADE.

57. If Falchi's improper conduct continues, E*TRADE will continue to lose its clients and their respective assets and, at this rate, E*TRADE could lose millions more in assets.

58. E*TRADE has no adequate remedy at law for the injuries it is currently suffering as a result of Falchi's wrongful conduct because the full extent and scope of E*TRADE's losses are not ascertainable. Specifically, because Falchi has now used E*TRADE's confidential information to solicit clients away, there is no way to un-ring the bell, as the clients cannot be forced to return to E*TRADE.

59. E*TRADE is likely to succeed on the merits of its claims because it has evidence that several of its clients have moved their assets over to Morgan Stanley after being wrongfully contacted by Falchi. Evidence of wrongdoing will grow once E*TRADE receives discovery from Falchi, which it is asking for on an expedited basis by way of an *ex parte* application that will be filed immediately after this Complaint. Upon receipt of Falchi's responses to its discovery requests, E*TRADE will move for a preliminary injunction, pending final resolution of the concurrently filed FINRA action, seeking the following: (1) an order prohibiting Falchi from further using E*TRADE's confidential information; (2) an order prohibiting Falchi from further

using E*TRADE's confidential information to solicit E*TRADE clients; and (3) an order requiring that Falchi return all of E*TRADE's confidential information, as defined and required in the Agreement.

60. The balance of hardships strongly favors granting a preliminary injunction here, as E*TRADE will continue to suffer irreparable harm if such relief is not granted and Falchi will suffer no hardship if such relief is granted. Pursuant to the Agreement, Falchi is prohibited from maintaining and/or using E*TRADE confidential information (such as client contact information), and from soliciting any of E*TRADE's clients using confidential information. Therefore, enjoining Falchi's conduct will simply put her in the position she agreed to be in both when she joined and when she separated from E*TRADE. On the other hand, E*TRADE will continue to lose clients and their respective assets at a rapid rate if Falchi's unlawful conduct is not enjoined.

61. Finally, and to be clear, all of the E*TRADE confidential and proprietary information that Falchi inappropriately obtained and used/is using qualifies as a trade secret under California law. Moreover, any suggestion that her agreement with E*TRADE cannot be enforced because the information is not a trade secret is immaterial, as the information still falls within the broader protections of California's unfair competition law, which independently supports an injunction against Falchi. *ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1022 (2005); *see also Destinations to Recovery v. Evolve Initiatives LLC*, No. B259011, 2015 WL 6755049, at *4 (Cal. Ct. App. Nov. 5, 2015). All of the information that Falchi acquired by virtue of her employment, except the compensation which she received, still belongs to E*TRADE, regardless of whether Falchi acquired it lawfully or unlawfully. CAL. LAB. CODE §2860. Falchi's use of that information is a form of "cheating" that must be enjoined because she is making gratuitous use of E*TRADE's significant efforts to create and maintain that information. *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1520 (1997). Thus, E*TRADE is likely to succeed on its claims before FINRA and should absolutely be granted a preliminary injunction in this action, pending final adjudication by FINRA.

**PRAYER FOR RELIEF**

WHEREFORE, E*TRADE prays for relief against Falchi as follows:

1. For a preliminary injunction, pending final resolution of the concurrently filed FINRA action, seeking the following:

    (a) an order prohibiting Falchi from further using E*TRADE's confidential trade secret client information;

    (b) an order prohibiting Falchi from further using E*TRADE's confidential trade secret client information to solicit E*TRADE clients; and

    (c) an order requiring that Falchi return all of E*TRADE's confidential trade secret client information;

2. For costs of suit incurred herein;

3. For attorneys' fees; and

4. For such other and further relief as the Court may deem proper.

DATED: May 28, 2019

By:      / s / Robert T. Matsuishi
ROBERT T. MATSUISHI

Attorneys for Plaintiff E*TRADE FINANCIAL CORPORATION

4812-2403-4968.3